As soon as you get ready, everybody leaves. I ought to tell you something. Maybe they've read the briefs. I don't know. Good morning, Your Honors. May it please the Court. My name is Jonathan Ball, representing Norfolk Southern Railway Company. This morning we're asking the Court to hold that the Bankruptcy Court and the District Court erred in dismissing, at the motion to dismiss stage, our claim to these disputed funds, which we claim in the complaint, are subject to the Interline Trust Fund Doctrine, previously recognized by the Sixth and Third Circuits. You want us to create federal common law here? Yes, we do, Your Honor. I always like it, but I feel that the precedents are stacked against us. Some precedents might seem that way at first blush, Your Honor, but when you dig into the two statutes in play here, and you look at the case law, I think this is well-suited and actually demands the application of federal common law. I would note that the Seventh Circuit, when they rejected it, and this is the case that both of the lower courts relied almost exclusively upon. It's a very fact-specific holding. The Iowa Railroad case... I think it's pretty general, though. Judge Easterbrook went through the statutory history, went through the various different theories, potential theories, and then finally concluded it wasn't appropriate to develop federal common law. Sure, it's a peculiar fact, but you could say the same thing about the Third Circuit case. You could say, well, that's a Class I railroad, not a Class III railroad. It has nothing to do with trucking. You can make the same distinction. Yes, but we don't use the bill and voucher system. The Class I system is different, and we think that the Sixth Circuit has, in fact, gotten it right when they said once it's interlined, it doesn't matter whether it's railroad to railroad, motor carrier to railroad, because both types of carriers are obligated, as a matter of federal statute, to interline with each other. In the federal government, the Congress delegated to now the STB as the authority to not only review but also implement in the first instance joint and through rates, which basically all these movements in dispute here are joint and through rate movements. CF could have taken the freight, trucked it from point of tender by the shipper to the consigned destination. They elected not to. They used other modes of carriage. They interlined, and that brings that system into play. Well, why does it place you in any different position, in a sense, than any other unsecured creditor? Well, what you have here is the transaction is this. A shipper desires to shipper its goods from location A to B, and it, in fact, paid for that. Well, I understand that, but conceptually, there are many, many creditors in a bankruptcy who could raise similar probably fact patterns. They say, well, I got the goods in commerce. In other words, what we have to do here is to give your clients some special footing that isn't afforded to other similarly situated entities in bankruptcy. That's a bit of a leap. I think the first conceptual difference is the donative intent of the payment, because keep in mind we were dismissed at a motion-to-dismiss stage. We never got to adduce facts and show what the intent of the parties was from the circumstances, but the donative intent of the shipper, when it tenders those funds, it's paying for every leg of that transportation, and there's a duty imposed on CF. CF, they're not claiming they earned every cent that was paid to them. In fact, in many of the movements, our earned division or share, as it's called, far exceeds what CF actually earned, and they knew that going in. The system was designed to make it easier for the shipper, because imagine the consequences if the shipper calls CF for this movement, and CF says, we'll truck it 100 miles to the railhead. We'll give it to Union Pacific, we'll give it to Norfolk Southern, and then the CSX deliver it to New York or Philadelphia. Well, why are you in a different position? Let me give you another example. Let's assume that you're selling trucks in interstate commerce, and you have several intermediaries. It's not unusual for money to be paid, not necessarily on a truck-by-truck basis, but on the basis of informal agreements. Basically, in the situation of bankruptcy, if you get proper security, it's enforceable. If you don't, you're an unsecured creditor. If you're referring to the sale of an actual truck, not the services, because don't forget, we're dealing in services here, and our services are as perishable as sometimes the commodities we're carrying. Once we render them, they're gone. There's nothing to take a security interest or collateral in what we've provided for value here. So that distinguishes us from sellers of durable goods, for example, in a truck. If you're a distributor, of course, it's the same situation to the extent the distributor has any claim of services over and above the price of the vehicle. But ours is purely services, because you could distinguish the two. I think they clearly are distinguishable. But I think what the Third Circuit has gotten right, and the Sixth Circuit likewise, and some of the district courts we've cited, is if you look at what we do and how we're regulated, every other aspect of our operation is federally regulated. Where we can operate, to a large degree what we can charge, the reasonableness of our practices, the reasonableness of our tariffs. If, while we're carrying goods on these movements, if someone claimed they were damaged during rail transit, there's federal question jurisdiction for them to sue us for that damage. What would this take you to do, for example, from a tariff that might be involved in an electricity case or telecommunications? The difference here is that one of the telephone cases that our opponent has cited is the payment is actually for use of the other person's facilities. We're paying you, our customer wants to make a call, and we're going to pay to use your facilities to continue the transmission. They're not paying us, the shipper is paying us. They did not buy services, they're not the owner of the goods. That's a difference here because the shipper has paid for all the movements, regardless of who did it. The telephone example is purchasing a right to use, they're not purchasing the right to operate. Why is that a distinction in terms of the federal regulation issue? Your argument was basically we're heavily regulated, we have tariffs, we have other informal arrangements that we have to assure payments. And it is true that the telephone example may be distinguished on its facts, but whether it's telephone or whether it's electricity or whether it's natural gas, those industries are very heavily regulated, both Federal Energy Regulatory Commission, local utility commissions. So I don't think the fact that you're regulated gets you where you need to go in terms of a federal common law. Why is it so different from those, that we demand a new common law right? It's one of the steps here, and it's because this case, there are plenty of industries that are heavily federally regulated. That's correct, they've cited them in the brief, Your Honor recognizes that. But it's the unique facts of our case and how intermodal transportation and interstate commerce works that's different. They're not paying for the right to use our tracks. Other railroads might, but that's not factored into a shipping cost. There's track leases, there's trackage rights, there's all sorts of ways to do that. But this is different than phone company A saying, I've got a call, I want to run it through your facility, I want to pay you for the right to run it through your lines. That's not what they're doing, because they can't use our lines. Only we can use those lines, unless we have some other agreement with them, which we don't. But can't you draw the inference from your being heavily regulated, that if Congress thought there was a need here, that Congress could create the rule? And since this is a rare thing we're told by the Supreme Court, why should we go out of our way to create a rule that Congress perfectly, or the regulatory body could, the ICC or whatever it is? The second half of your question is the real interesting part of it, as relates to dismissing on a Rule 12b-6 motion. Had the facts been developed, then the court might have sua sponte or on motion, referred it to the STB, which would have primary jurisdiction, because the handling of the payment of these rates could be considered an unreasonable charge or an unreasonable practice, and that would fall within primary jurisdiction of the STB. But by saying, as a matter of law, there's no set of facts in this universe on which you could be entitled to any relief, without allowing discovery and seeing factually how our relationship works, to consider whether it is in fact different as we submit from the telephone carriers and the airlines. That that's the mistake. Well, let me take a different tack on that. Congress, apart from what Congress might have done in regulating interstate travel, Congress did pass a bankruptcy code that provides for priorities, and if it wanted to provide for a priority or special treatment, it could have done that, as it did in many, many other instances. But it's not... in what we can do as courts to create additions, if you will, common law additions to the bankruptcy code. But Congress also enacted 541D, which is where our claim lies, at least the way we framed it in our complaint. So the question is not priority amongst creditors to what is admittedly the debtor's estate. Our position is that we believe we can prove and should be offered the opportunity to adduce our facts to prove that those funds were never part of the estate, and if they're not part of the estate, there's no priority question, there's no rateable distribution question. And our opponents in reply to our brief have argued, well, you know, that destroys rateable distribution. On the one hand, they say there's no federal interest in this case, and they say the reason to dismiss it is that rateable distribution is an important federal policy of the bankruptcy code that would be eviscerated if you allow their claim. It seems to me that that's inconsistent. Excuse me, I'm not sure I see the contradiction in that position. Well, first of all, if it's not part of the estate, which is our argument, then rateable distribution doesn't come into play. But to say there's no significant federal interest involved in this case... Well, no, but that's just... Obviously there's a federal interest involved because it's a bankruptcy distribution, and that's why we're here instead of in state court. And also because it's freight charges, which would independently justify it supports federal question jurisdiction. So it's a matter that Congress wanted federal oversight of and federal jurisdiction, rather than leave these to the vagaries of the different states' laws. Because think about if you apply patchwork state-by-state law to this problem, then do you have carriers saying, well, CF or next trucking company, I think you're in a little financial difficulty. So if you want to interline with me, you can't do it in Chicago because that's in the Seventh Circuit. You can give it to me in Ohio. That's in the Sixth Circuit. I'll do business with you there. Well, that's what you're faced with right now, given the circuit conflict, isn't it? We are, but that's the reason why there should be a uniform federal common law, and that's why we think the Sixth and Third Circuit have the better view of this problem than the Seventh Circuit, because it certainly wouldn't be the most effective means of promoting cooperation amongst carriers and smooth economic and operative conditions in the transportation industry to force carriers to do that. I don't grow with your statement of policy objectives, but that falls a little bit short of saying Congress intended to do something in a field as a part with every other field that involves interstate commerce. And what you're asking us to do is to say, well, no, there was a clear intent of Congress, but Congress didn't do anything about it, so we're going to have to conjure this up as federal common law. It is a leap. I'm not saying we won't take it, but it's a big leap. I understand that. I think there's further support for it in the case in our reply brief, which is the Norfolk Southern v. Kirby case, which although dealing with a maritime transaction, it was an international shipment on a through bill of lading that then involved Norfolk Southern on inland domestic carriage. The court talked about what inherently local interest is there to determine any rights and liabilities of carriers and shippers under a bill of lading. In the modern economy, in modern interstate and international commerce and transportation, you don't want to submit things to the vagary of different states' laws. You want to have a body of uniform law because that promotes effective and efficient interstate commerce and transportation. And certainly that wasn't around when Iowa was decided. It wasn't around when the Third Circuit and Sixth Circuits made their decisions, but we think they've been a better predictor of how this problem ought to be resolved. Well, it's really, conceptually, I find it hard to distinguish, for example, from the situation involving the PG&E bankruptcy where you have multiple distributors and consumers of electricity in basically the same boat you're talking about. And I think it really does have some profound consequences if we say as a matter of federal common law we can impose a constructive trust on the circumstances. But the groundwork has been laid, whether this court chooses to follow the Third and Sixth or the Seventh Circuit, we think that the groundwork is there. And if you look, our opponents talk about what Congress didn't do in the last amendments to both the Bankruptcy Act and even the Interstate Commerce Termination Act, which begat the STB. They knew of the Third Circuit's decision. They didn't overrule it. They're saying that Congress didn't enact or adopt the Third Circuit. Congress usually doesn't adopt a decision. If the decision's out there and they have no problem with it, why address it? It's when they don't like a court decision that they will take affirmative action and say, we're writing this to legislatively overrule something. So they didn't do either. What they did do, at least in the 78 code, is fail. Well, as the Seventh Circuit points out in its decision, a specific provision that would cover this was tendered and defeated. It was not included in the bill. Now, we can't draw anything definitively from that, but it does provide some indication that Congress was aware of the problem and chose not to deal with it directly. But I don't know that that's any more persuasive than the fact that the Supreme Court was asked to hear the Penn Central case and denied cert. I mean, someone proposed this is wrong, something different should be done. And at the time, the Supreme Court was not prompted to act on it. So the fact that a proposal was defeated, they didn't take that next step and say, we're aware of Penn Central, we don't like that decision, we're legislatively overruling it. So I don't think that the field is tipped as far as our opponents say. And I think if you look at the three criteria for federal law, when federal common law is appropriate, they're all present here. And the one that our opponent seems to focus on the most is that you have private parties and that that diminishes and maybe gets rid of the need for a federal common law. But we've had that in other areas, from age discrimination, racial discrimination, the employment cases, the litigants are private parties. The rights and obligations are creatures of federal statute. And the courts have stepped in where the legislation is silent, like the shifting burden of proofs. Congress didn't say, this is what you have to do to win the case. They said, here are some rights, and the courts had to fashion how the intent of Congress is best going to be carried out in the absence of Congress doing it specifically. What we have here is a statute, we have regulations. There was a problem that perhaps they just didn't carry all the way through and think of every permutation of it and specifically address it. But federal question jurisdiction is granted for all these issues. Congress clearly thought that the federal courts would become involved in it. And here's an instance, just like the shifting burdens in the employment cases, where it begs the court to say, how are we going to interpret this? That's what statutory construction is for. And this is an area where the court needs to take that next step and say, in order to affect Congress's intent in the rail transportation, and also under 541D of the bankruptcy code, how are we going to make determinations whether something is or is not part of the bankruptcy estate? There are instances where it's a smaller scale. If someone doing their own home, a single home construction, and a contractor goes bankrupt and hasn't paid his subcontractor, that's a smaller scale and it might be perfectly appropriate for state law to determine what the relationships are between that contractor and subcontractor. But here, why should the relationship between Norfolk Southern and CF, for example, be different whether the interchange occurred in the Seventh Circuit, the Sixth Circuit, or Third Circuit? Are you so sure you'd lose under state law? It might have been a better claim for you. Excuse me? Are you so sure you'd lose under state law, under constructive trust theory? It might have been a better theory for you. But we didn't even have the opportunity to reduce facts and amend pleadings in accordance with them. We said this is recognizable under a trust that other cases have acknowledged already. And the district court came back and said, well, Iowa Railroad, I'm going to follow that. It's more persuasive. The court did say, you know, I'll give you the opportunity to amend, but I think this is more persuasive. I don't see any reason to do it. Then we would have to go back and look at every single transaction. Where was the interchange taking place? What would determine which state's law governed? Whose state's law would have the primary interest in governing this resolution? Where the payment was made? No, where the trust is imposed. That's trust law in terms of conflicts of law, where you seek to impose the constructive trust. Well, in the case of interlining, would it be where the goods are exchanged, where the payment was tendered, where the payment was received by CF? Because you still have to look back at the donative intent of the shipper. That payment was earmarked. It's the only reason they make that payment is to cover the cost of transporting goods from point A to point B in interstate commerce, regardless of the number of carriers involved. Most of the time when you're looking, we're more concerned about people not paying for the shipment. Here, the shipment was paid for. This case is an even stronger case because CF can't articulate what interest they really have in those funds other than their own earned division, and I would suggest that if the STB, if the case were to develop that one carrier was accepting payment and not remitting other carriers' earned portions, that the STB might declare that is an unreasonable practice. You can't do that. If they did, then how does the STB ruling interplay with different states' courts' views of constructive trust law? This is an area that is so highly regulated that the STB has primary jurisdiction over so many aspects, including there's petitions for declaratory orders in the STB. It would be the same thing here. Well, the statute doesn't address this specific circumstance, and the courts have recognized, including Your Honor has recognized recently in a case that's not in our brief. I can give you the citation. West Coast Truck Lines, Inc. versus Weyerhaeuser Company. It's at 893 F2nd 1016, and Your Honor discusses primary jurisdiction of the ICC and now STB, and that there are certain issues that are just so specific to this industry that they demand referral to the STB. But we were cut short of even putting, trying to deduce the evidence, finding out how were these payments handled prior to your bankruptcy? When did you remit them? Did you ever claim that you had some entitlement that would enable you not to remit other carriers' earned divisions? So our argument is the court should follow the Third and Sixth Circuits and adopt the federal common law rule of the interstate trust doctrine. It doesn't end the case here. A remand is necessary, either to let the STB determine what practices they should have engaged in with respect to those funds, or to allow us to do the tracing and say, we can show we participated in movements A through Z, and we can show that you got paid for those movements, and that would determine how much we can recover. All right. I won't let you overload your time. I see that. I appreciate the court's indulgence. And we understand your commitment. Thank you, Your Honors. May it please the Court, Robert Kleinman of Latham & Watkins on behalf of Consolidated Freightways. Norfolk Southern, in getting into the donative intent of the shipper and whether or not a constructive trust should be imposed, fails to establish what the Supreme Court has said is an absolutely critical foundation to the establishment of federal common law, and that is a unique and important federal interest that would be in substantial conflict with state law. And the best Norfolk Southern can do is to contend that a unique federal interest exists to promote coordinated and efficient rail transport or to ensure that the carrier actually receives payment. Neither of those can withstand scrutiny. First, with respect to the claim that the promotion of efficient and coordinated transport is a unique federal interest, Norfolk Southern ignores the fact that for 100 years before Penn Central, there was no federal common law governing interline transportation. The railroad transportation system seems not to have halted in the Seventh Circuit or in any of the ten circuits where circuit courts have not adopted the Third and Sixth Circuit position. The Supreme Court has also said that the principle of uniformity to promote the efficient and to coordinate transportation is the weakest of all justifications for federal common law. And other industries, as your Honors have noted, have similar bland policy statements about the promotion of efficient coordination, but courts have routinely treated their interline balances as general debts. For example, in telecommunications, the main purpose of the Telecommunications Act of 1996 was to take the regulation of local telephone service away from the states and, according to the Fourth Circuit, establish a new federal regime designed to promote competition. Yet those debts between telecommunications carriers are recognized as general unsecured claims in a bankruptcy. Similarly, the airline cases treat interline debts the same way. Now, as a backup, Norfolk Southern identifies 48 U.S.C. 10705 as manifesting congressional policy that the courts should ensure that carriers actually receive their payments. That's their argument. But that statute, 49 U.S.C. 10705, says no such thing. 10705A1 provides that the Surface Transportation Board may, may not shall, may prescribe the division of joint rates and shall if the public interest demands it. There's no discussion in the statute of what the public interest is. But A1 says nothing about interline trust debts. 10705B provides that the Surface Transportation Board shall prescribe rates to be received by a carrier. That's Norfolk Southern's hook, that language. When the board determines that the division of rates will violate 49 U.S.C. 10701. But 49 U.S.C. 10701 has nothing to do with interline balances. Instead, 49 U.S.C. 10701 is a statute prohibiting discrimination in rates. Subsection A describes division of joint rates must be made without unreasonable discrimination. Subsection B, the rail carrier may not discriminate in rates. Subsection C, unless otherwise prohibited by statute, a carrier can establish any rates for transportation. And Subsection D, rates for carriers with market domination must be reasonable. Nothing in 10701 or 10705 mandates a federal interest, a unique and strong federal interest, in ensuring that Norfolk Southern, a sophisticated commercial party able to contract for its own protections, could or should get priority over every other creditor in a bankruptcy case. They are factually no different, in line and having the same rights, as other people who were instrumental to the operation of Consolidated Freightworth. There are two counts to the complaint. The first count in the complaint deals with, I think, fairly by the interlining. The second one is just a generic constructive trust count. Yes, Your Honor. Why isn't it appropriate to send it back to the Bankruptcy Court for – well, why was it appropriate for the Bankruptcy Court to grant a 12B6 motion on a generic constructive trust argument without taking evidence? In the Ninth Circuit, In re Mark Air and other cases have held that a constructive trust remedy is not available in a bankruptcy case where a party has not obtained a judicial impression of a trust on a specific race before the commencement of a bankruptcy case. That the claim of trust that is not perfected in that way is inchoate and is subject to avoidance under the trustee strong-arm powers under Section 544. And that has been established in the Ninth Circuit for some period of time. We briefed that below. The Court ruled on that below. And on that point, Norfolk Southern has not appealed. The Court below said, all right, if you – after listening to the similar types of arguments made below, the bankruptcy judge said, all right, if you think you can show that there was actual intent to create a trust by either by contract or by the operation of the relationships between the parties, I will grant you, Norfolk Southern, 45 days leave to amend to file a complaint for a resulting trust. They didn't do it. They decided to rest their entire case on whether or not federal common law should be applied to create this inter-aligned trust theory. What they ignore, as pointed out by the Seventh Circuit, is that there is nothing in the statute which prohibits creditors like Norfolk Southern from taking contractual protections to perfect themselves. Norfolk Southern could have at the outset of the relationship or at any time said, you know what, I'm not going to take this next shipment. I'm not going to have anything further to do with you unless you post a letter of credit for the average amount of the balance that you owe, that UCF owes us at the end of every month. They chose not to do it. That is an administratively simple way for Norfolk Southern to protect itself, not only in this case but every other. They decided not to do it. Now, there's also no conflict with state law. The second hinge of the argument, of the test set forth by the Supreme Court. Since at least 1979, the Supreme Court in Butner v. U.S. has held that property rights in bankruptcy cases are to be determined by state law. That's to avoid the windfall for one party getting different rights in a bankruptcy case than it might have outside of a bankruptcy case in terms of what its actual property rights and claims were vis-a-vis the debtor. It's well established under Supreme Court precedent that the bankruptcy courts should only modify the usual state law remedies and rights to the extent that such Now, Norfolk Southern argues, well, at the time that the bankruptcy code was amended in 1978, they didn't have to legislatively overrule Penn Central. It was the only case out there and what's the big deal? Well, prior to Penn Central, as identified in the Seventh Circuit case, there were many cases stating that there was no inner line trust theory that granted a priority above and beyond other unsecured creditors in favor of railway companies. Moreover, since that time, the bankruptcy code has been amended several times, including an amendment which occurred effective as of October 18 of this year. At no time since 1978 or thereafter has the bankruptcy code been amended to create this remedy. In addition, none of the interstate commerce acts provide the specific remedies sought by Norfolk Southern. And when Norfolk Southern argued his point earlier, he said, well, our area is extremely heavily regulated and therefore you should take the liberty as judges to create a remedy. Well, the Supreme Court has already said in Texas Industries that where an area is heavily legislated and heavily regulated and Congress has decided not to create a remedy, it is not up to the courts to create that remedy. Courts can interpret. In the shifting bands of burdens of persuasion that Norfolk talks about, that's an interpretation of the statute. Here, the Supreme Court has said in the antitrust case that antitrust regulation was around for 93 years. Congress had determined to regulate many aspects of it but not to grant a right of contribution. So the courts were not going to create that right of contribution. Here, there are many, many regulations and statutes dealing with intermodal transportation, the rights of railway carriers, and the operation of interstate commerce. Yet Congress has never decided to specifically identify that the balances between interline carriers should have the remedy and the right of having this trust status. It would have been perfectly easy for them to do it. And congressional silence, according to the Supreme Court, is highly instructive. Now, the Third Circuit and the Sixth Circuit didn't get it right. The Third Circuit in Penn Central got it right in one respect and that was as a trust case. The majority opinion in Penn Central, which is the major case relied upon by Norfolk Southern, is one based on analysis of state law. Not an analysis of federal common law. The Penn Central majority held that the principal problem before us is one of accounting for funds belonging to another readily resolvable by recognized trust and pragmatic considerations. That's at 527. The concurring opinion criticized the majority for relying on the time-worn tenets of trust law. There's no mention of federal common law in the majority and no identification of a unique federal interest threatened by an application of state law. Now, the concurrence says we don't really like this application of trust law because we don't think it's broad enough, so we're going to apply federal common law. But in so doing, the concurrence undertook no rigorous analysis of what the federal interest was versus what the conflict with state law would be. And in fact, the conflict identified in the concurrence was that the departure from the interline netting might well undermine the entire system of interline rail transportation. Well, that has not occurred. As I mentioned, in 10 or 12 circuits, there's no federal common law decision at the circuit court level identifying that these interline trusts need to be held as something other than debits and credits. In Ray Lehigh, which is another circuit case, the parties assumed that federal common law would apply. And the court raised the issue, should federal common law apply or not? The parties had just assumed it. The court looked to the congressional policy of encouraging interline rail transportation, just like Norfolk Southern did. But the only conflicts identified were if local state boundaries were created to interrupt intermodal transport, or that a lack of uniformity in the balancing of interline accounts would assure the destruction of the nation's railroads. Well, that hasn't happened, and that isn't a conflict or a worry that has threatened the viability of the railway system since that time. In Columbia Gas, which is also cited by Norfolk Southern, the Third Circuit got it right. And they got it right because Columbia Gas involved a federal program that created a rebate with specific direction that the funds for that rebate would flow through conduit corporations to the ultimate beneficiary. The very purpose of the federal rule was to supersede private contractual arrangements. The application of state law, according to the court, would frustrate the clear and specific federal objective. And when Columbia Gas discussed Penn Central, it did so in its section and discussion on trusts, not federal common law. Norfolk Southern also cites, too, Ann Arbor Railroad, the Sixth Circuit case. And in that case, there was no analysis of standards for the application of federal common law. Merely adopted Penn Central without any discussion of a unique federal interest or state law conflict or any disruption of commercial expectations. Now, Norfolk Southern, let me back up for one second. The cases recognizing federal common law are very different than the instant case. They all identify and protect a specific federal interest. For example, the floating of securities by the government in Clearfield Trust. The rights of the United States under federally created lending programs like U.S.B. Kimball. And the cases cited by Norfolk Southern do not carry the day. In Kirby, for example, the most recent case that Norfolk Southern cited, a federal act, the Carriage of Goods by the Sea Act, fixed limits of liability. The contract was maritime and the dispute was not local. An Australian manufacturing company sold containers of machinery to a GM plant in Alabama. The manufacturing company hired an Australian freight forwarder. The freight forwarder issued a bill of lading. The bill of lading invoked the default liability under the Carriage of Goods by the Sea Act. A German ocean shipping company hired Norfolk Southern to transport machinery from the port in the U.S. to Alabama. The Norfolk Southern train derailed, caused damage to the machine, and the issue was whether Norfolk Southern was subject to the limits of liability. The parties again assumed federal law apply, and the court agreed. And the court said the issue there was not a creation of a new remedy, but it was merely an interpretation of a contract. And the court held that federal common law governed maritime disputes because there was a constitutional mandate to protect and regulate maritime commercial intercourse between the United States and other nations and between states and those other nations. In this reply, Norfolk Southern also argues that under 541V, whether the debtors held in trust the balance of an overfunded pension plan must be determined by federal common law and not state law, citing EDS pension in the Edison Brothers case.  That case looked to constructive trust law under 541, and as I mentioned, the Ninth Circuit has already spoken on that, that if you haven't impressed the race with a trust before the commencement of a bankruptcy case, there's no trust that survives. Norfolk Southern also argued and cited CAR transport, that an action by a common carrier to recover unpaid freight charges presented a federal question supporting jurisdiction. The federal policy here was to avoid discrimination, and therefore any action between the carriers and the shippers arising from a filed rate was subject to presenting a federal question. But that's not our case. There's not a dispute about a filed rate. Consolidated does end up with a windfall. Consolidated doesn't end up with a windfall. The other creditors who are similarly situated, who may have advanced product and not been paid for, or advanced funds and not gotten goods, share ratably under the bankruptcy code. It's not a windfall to CF. It's an equitable distribution for parties in a bankruptcy case who had the same protections and rights vis-a-vis consolidated freight ways as Norfolk Southern. How much money is at stake here? The complaint pled $1,492,000, I think. $1,492,000 or give or take a few thousand. And what's the status of the bankruptcy? The status of the bankruptcy is that the case confirmed there was a liquidating plan of reorganization and money is being distributed to creditors pursuant to that plan of reorganization. Creditors voted on the plan, and the plan was successfully confirmed and has gone effective, and distributions are being made as set forth under the plan. Subject to the outcome of any litigation such as this? Yes, I believe there are reserves for litigation claims and the like. Where is Consolidated Freightways? Consolidated Freightways is liquidated. They're not operating. Not operating. No. They've had a number of sales to sell their assets, and they've liquidated their real estate and their trucks as far as I know. What's important about... What were their assets in bankruptcy? The description of the assets or the dollar amount? Dollar amount, yeah. It was the third largest trucking company in the United States. I don't know off the top of my head what it was, but it was in the many hundreds of millions of dollars. I remember seeing a lot of their trucks on the road. They had a big terminal in Berkeley and other places. Your Honor, I might also add that in CAR Transport, which was cited by Norfolk Southern, the court held that subject to the rule that prohibits discrimination, the parties are free to contract when or with whom and when the freight charges should be paid. Last, Your Honor... I think you used your time up. I had... Oh, I'm over. Your Honor, in sum, this is not one of the extraordinary cases that demands federal common law. They haven't identified or argued the standards, and under the U.S. Supreme Court rulings, the application of federal common law is an extraordinary remedy to be used few and far between and only in restricted cases. I don't want to see you leave here suffering. Use a lot of your time and questions, too. Thank you, Your Honors. I appreciate the indulgence. The first point I wish to make is the Seventh Circuit, whose Iowa decision we've been discussing, one week after they decided the Iowa case, they discussed the self-help that our opponents, as we should have availed ourselves of, and they said, these are bazookas too powerful for the problem at hand and too harmful to shippers caught in the middle. It's at page 27 of our brief. Even the Seventh Circuit doesn't want it to result in railroads refusing to take goods in interchange and keep the flow of goods moving. The second point is, earlier today, there was some discussion of, let's not let common sense get lost in all this, and there's two aspects of common sense here. One is, what is CF's claim of entitlement to the unearned portions of the shipment costs that were paid by the shippers? Your Honor asked, didn't they have a windfall? And they said, well, we don't get any of it, so it's no windfall to us. Common sense here, and the statute, of course, says that their creditors can't have any more rights than they had. So common sense and logic. If they had no right to it, neither did the creditors of the bankruptcy estate. And the other common sense point is, what's happened to all the railroads? Over half the cases cited in both parties' briefs are railroads that have gone bankrupt. There's only four or five class ones left. The economic conditions in this industry, these are the types of problems we suffer from, and this is why there are so far fewer railroads than there were before. So let's not lose sight of that in the common sense part of the formula. Well, railroads have been having problems since the first tracks were laid. True, it's always been a perilous industry, but so many of them have gone bankrupt, and this is just one example of what happens and why that ended up happening and why this is an important enough interest to warrant federal common law. Thank you, Your Honors. Thank you. I submit this matter and come to K&S.
judges: Pregerson, Noonan, Thomas